NORTH CITY AREA–WIDE COUNCIL, INC., Benjamin James, Glendola Mills, Lewis T. Berry, William Manson, Euliel B. Hackett, Japhers Parks, Rosetta B. Jefferies and Nathaniel King, Appellants,

v.

George W. ROMNEY, Secretary of Housing and Urban Development, Department of Housing and Urban Development, Department of Housing and Urban Development, James H. J. Tate, Mayor, Goldie E. Watson, Model Cities Administrator and City of Philadelphia.

No. 18466.

United States Court of Appeals, Third Circuit.

Argued June 15, 1970.

Decided July 14, 1970.

William S. Rawls, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa. (Edwin D. Wolf, Lawyers Committee for Civil Rights Under Law, Philadelphia, Pa., J. Anthony Kline, National Housing Law Project, Earl Warren Legal Institute, University of Cal., Berkeley, Cal., Matthew M. Strickler, Levan Gordon, Philadelphia, Pa., on the brief), for appellants.

Judith S. Seplowitz, Dept. of Justice, Washington, ·D. C., argued for Federal appellees (William D. Ruckelshaus, Asst. Atty. Gen., Louis C. Bechtle, U. S. Atty., Alan S. Rosenthal, William D. Appler, Attys., Dept. of Justice, Washington, D. C., on the brief).

Matthew W. Bullock, Jr., Philadelphia, Pa., argued for municipal appellees (Edward G. Bauer, Jr., City Solicitor, Philadelphia, Pa.), on the brief.

Peter Hearn, Philadelphia, Pa., argued for amicus curiae-Housing Assoc. of Delaware Valley. (Marilyn Mauskopf, Philadelphia, Pa., Pepper, Hamilton & Scheetz, Philadelphia, Pa. on the brief).

Before McLAUGHLIN, STALEY and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The primary issue in this case is the meaning of the requirements in the Demonstration Cities and Metropolitan Development Act of 1966,[1] that to be eligible for Federal aid, a "comprehensive city demonstration program," must "provide * * * widespread citizen participation in the program" and the Secretary of Housing and Urban Development must "emphasize local initiative in the planning * * * [of it]."[2]

These requirements form a central and novel feature of the Demonstration Cities Act, in whose prologue the Congress declared:

"* * * that improving the quality of urban life is the most critical domestic problem facing the United States. The persistence of widespread urban slums and blight, the concentration of persons of low income in older

---

1. 80 Stat. 1255, 42 U.S.C.A. § 3301 et seq.

2. 42 U.S.C.A. §§ 3303(a) (2), 3303(b) (1).

urban areas, and the unmet needs for additional housing and community facilities and services arising from rapid expansion of our urban population have resulted in a marked deterioration in the quality of the environment and lives of large numbers of our people while the nation as a whole prospers. * * *" 42 U.S.C.A. § 3301.

The purpose of the Act stated by Congress was "to provide additional financial and technical assistance to enable cities of all sizes * * * to plan, develop and carry out locally prepared and scheduled comprehensive city demonstration programs * * *." 42 U.S. C.A. § 3301. The basic philosophy of the Act was well-expressed by the Department of Housing and Urban Development ("HUD") in a statement of its policy concerning citizen participation: " * * improving the quality of life of the residents of a model neighborhood can be accomplished only by the affirmative action of the people themselves. This requires a means of building self-esteem, competence and a desire to participate effectively in solving the social and physical problems of their community." [3]

Pursuant to the Act, the City of Philadelphia applied on March 3, 1967, to the Secretary for a grant to plan and develop a Model Cities Program in Philadelphia. Soon thereafter, Appellant North City Area-Wide Council, Inc. ("AWC") was organized in the target area [4] from a large number of existing organizations, and entered into a contract with the City to provide the local "citizen participation" in the Philadelphia Program. After several extensions, this contract was to terminate on June 30, 1969.

On November 16, 1967, the City received a grant of $203,000 from the Secretary for the planning and development of its Model Cities Program. After more than one year of extensive planning by,

and consultation between, the City and AWC, the City submitted to the Secretary on December 31, 1968, an application for a grant to implement a Model Cities Program in Philadelphia.

On April 30, 1969, after further consultation among HUD, the City and AWC, this application was supplemented. A large portion of the program was to be administered by seven non-profit corporations. A majority of the directors of four of the corporations and at least sizable minorities of the directors of the other three corporations were to be chosen by AWC.

The City's presentation concluded that the two basic causes for the conditions in the target area are poverty and powerlessness. A central aim of the Philadelphia Program, therefore, was to provide Model Cities residents with an opportunity to participate fully in City decisions affecting this area and "to assume some control over their own economic resources."

On May 27, 1969, HUD objected to the proposed Program because of insufficient involvement by the City and too much reliance on AWC in both operation and evaluation of the Program. On June 9, 1969, the City thereupon submitted a "Supplementary Statement" to its Model Cities Program application. This Supplementary Statement substantially reduced the operational role of AWC and established as new policy that AWC would not be permitted to nominate more than one third of the directors of the new corporations. The remainder of the directors would be chosen by Philadelphia's Model Cities Administrator or by citizen organizations (other than AWC) chosen by the Administrator. The June 9th Supplementary Statement of City policy, amending the original application for Federal funds, declared that it had been "pre-

---

3. City Demonstration Agency Letter No. 3 (Oct. 30, 1967).

4. "Target area" is the term popularly used to describe what the Act refers to as "the area of the city covered by the [Model Cities] program." 42 U.S.C.A. § 3303(a)(1).

pared by the [Model Cities] Administrator without the participation * * of the Area-Wide Council."

In accepting on July 3, 1969, the City's amended proposals, HUD unilaterally added two more restrictions to AWC's participation: (1) no member of the board of directors of the operating corporations may be a member of AWC after the first year of operations, and (2) after the first year, no board members may be selected by AWC. Local citizens were not consulted with respect to either the "Supplementary Statement" or the new HUD conditions of July 3rd. Yet, each effected a fundamental change in the City's Program. Because of these changes which AWC considered unlawful, and because the City refused to negotiate with AWC concerning them, AWC refused to enter into a new contract to serve as the citizen representative for the Program beyond June 30, 1969.

The City then accepted a one-year grant from HUD in excess of $3,000,000, and began organizing a new citizen group to represent the target area. AWC invoked the District Court's jurisdiction in a class action pursuant to 28 U.S.C. §§ 1331, 1361, and sought to enjoin implementation of the program until the legality of the actions taken by the City on June 9th and by HUD on July 3rd was determined.

The District Court, by the Honorable John Morgan Davis, dismissed the complaint on motions for summary judgment by the City and HUD on the ground that the plaintiffs lacked standing to sue. The District Court further held that even assuming the requisite standing, neither the City nor the Secretary had violated the Act or HUD's regulations.

The issue of standing was not pressed by the Government on appeal, in view of the Supreme Court's recent decisions in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Accordingly, we may assume AWC here has standing to challenge the Secretary's grant to the City. *See also*, Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968); Coalition for United Community Action v. Romney, 316 F.Supp. 742 (N.D. Ill., April 6, 1970).

The Administrative Procedure Act provides that "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

Unless the language or structure of a particular statute precludes judicial review, there is a presumption that administrative action is reviewable. Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The Demonstration Cities and Metropolitan Development Act has no provision which precludes judicial review. Coalition for United Community Action v. Romney, *supra*. Moreover, the issue here does not concern, as claimed by the Government, "agency action * * * committed to agency discretion by law." (5 U.S.C. § 701(a) (2)). Instead, it concerns the question whether the administrative agency has conformed with the statutory requirements, and this question is a proper subject for judicial review. *See* Scanwell Laboratories v. Shaffer, 424 F.2d 859, 874–875 (D.C. Cir. 1970).

Appellants do not claim to possess a veto over proposals by the City or HUD. They contend, however, they have the right to be consulted and to participate in the planning and carrying out of the program. Such a right—within the provisions of the Act—is in fact required by HUD's own administrative pronouncements.

The Act directs the Secretary to "emphasize local initiative in the planning, development, and implementation" of local programs, 42 U.S.C.A. § 3303(b) (1), to insure "prompt response to local initiative" on the part of the federal government, 42 U.S.C.A. § 3303(b) (2), and to insure that all Model City plans pro-

vide for "widespread citizen participation in the program." 42 U.S.C.A. § 3303(a) (2). In its primary statement of policy concerning the content of "citizen participation," HUD has stated:

"The implementation of this statutory provision requires: (1) the constructive involvement of *citizens in the model neighborhood area* and the city as a whole *in planning* and carrying out the program. * * * The city government * * * will be responsible for insuring that whatever [local citizen] organization is adopted provides the means for the model neighborhood's citizens to participate and be *fully involved in policy-making, planning* and the execution of all program elements." City Demonstration Agency letter, No. 3, Oct. 30, 1967. (Emphasis added).

█ In this case, neither the "Supplementary Statement" sent to HUD by the City on June 9th, nor the requirements added by HUD on July 3rd, involved any citizen participation. The fact that both the City and HUD were already familiar with AWC's views does not excuse them from consulting with AWC about specific major changes.

█ As noted above, the issue is not citizen veto or even approval, but citizen participation, negotiation, and consultation in the major decisions which are made for a particular Model Cities Program. While not every decision regarding a Program may require full citizen participation, certainly decisions which change the basic strategy of the Program do require such participation. The June 9th decision of the City and the July 3rd statement of HUD made such fundamental changes in the Philadelphia Program. Previously, that Program had contemplated a much heavier involvement by the designated citizen participation component, AWC. This involvement was drastically reduced by the unilateral actions of the City and HUD. The Secretary therefore violated the Act when he accepted a proposal for major modification of the Model Cities Pro-

gram from the City which made clear on its face there had been no citizen participation in its formulation, and when he imposed additional significant terms of his own without citizen consultation.

While such a violation of the statute by the Secretary might require us to consider illegal all actions taken since June 9, 1969, by the City and HUD with respect to the Philadelphia Model Cities Program, counsel for AWC at oral argument stipulated that we need not reach this issue and, therefore, we do not consider it.

The judgment of the Court below will be reversed and the case remanded to the District Court for further proceedings consistent with this opinion.